Olympia GADANO and John Gadano,
Plaintiffs-Appellants,

v.

Arthur J. MILLER, Administrator of the
Estate of William S. Badge, Deceased,
Defendant-Appellee.

No. 14883.

United States Court of Appeals
Sixth Circuit.

Feb. 15, 1963.

George Downing and Morton Schneider, Detroit, Mich. (Kelman, Loria, Downing & Craig, Detroit, Mich., on the brief), for appellant.

Lawrence A. Bohall, Detroit, Mich. (Cary, BeGole & Martin, Detroit, Mich., on the brief), for appellee.

Before McALLISTER, Senior Circuit Judge, and DARR and BOYD, District Judges.

McALLISTER, Senior Circuit Judge.

This is an appeal from a judgment entered on a verdict of no cause of action in a personal injury case, brought by appellants, and involving an automobile accident. Appellants claim reversible error because of the admission of evidence of improperly certified copies of records, and hearsay testimony, as well as claimed impartiality of conduct on the part of the trial court, and argumentative and misleading instructions to the jury.

The background of the case is as follows: On July 5, 1958, appellants, John Gadano, and his wife, Olympia Gadano, were passengers in the rear seat of an automobile being driven on the Massachusetts Turnpike by Vincenzo Amore, who was accompanied by his wife.

The Massachusetts Turnpike is a dual highway, the eastbound and westbound lanes being separated by a grass median strip. Next to the median strip on either side is a three-foot lane. Then there is a solid line. The eastbound lane, adjacent to the solid line, consists of two twelve-foot lanes, separated by a broken line; then a solid line; and then a ten-foot emergency lane made of macadam. Adjacent to the emergency lane is the shoulder of the road and next to the shoulder there are sometimes fences.

When Mr. Amore drove on the Massachusetts Turnpike, he was headed in an easterly direction. After a short time

he discovered that he was going in the wrong direction to reach his objective. He then drove over to his right onto the ten-foot emergency lane, to the right of the two eastbound lanes, and came to a stop, to think matters over. He wanted to get over into the westbound lanes and head in the direction opposite to which he had been driving.

The proper and legal way of getting from the eastbound lanes to the westbound lanes was to continue to proceed east until he could drive off to the right at an interchange, and, after crossing over or under the Turnpike, come into the westbound lanes at an angle from a westerly direction, without interfering with traffic or crossing in front of oncoming vehicles.

Instead of driving onto the interchange, Mr. Amore decided to get into the westbound lanes by crossing over the two eastbound lanes from the emergency lane where he had stopped, and driving across the median strip separating eastbound lanes from westbound lanes, then completing a U-turn into the westbound lanes. This was against the law and, on the high-speed Turnpike, was an extremely dangerous thing to do. The maximum legal speed limit on the Turnpike is sixty miles per hour; the minimum, forty miles per hour.

Mr. Amore testified that when he stopped on the right-hand eastbound emergency lanes, he was, at that time, about thirty or forty feet west of a "cutaway" or "crossover," which is a gravel space, twenty-five feet wide, level with the surface of the highway, and which goes across the median between the east and west lanes of the highway. The median is about twelve feet wide—"about the length of a car."

When he started to leave the emergency lane, in order to pass over the median, Mr. Amore testified that he opened the door of his car at his left, looked back and saw nothing coming for about 400 or 500 feet. After he looked back, he stated that he then proceeded ahead a little for about six or seven feet and then started to drive, "creeping ahead," at an angle of about 45° to the left toward the crossover. When he got out in the center of the eastbound highway, he started to look ahead. When the front end of his car was either at the center line, or was just passing over the center line of the eastbound highway—the line between the so-called traveling lane and the passing lane—he heard brakes screeching. At that time, he was "just moving," "two or three miles per hour at the most." He testified: "When I looked, there was a car, near to the island, the outside lane (of the eastbound lanes) going east, and I would say he was about 125 to 150 feet away when I heard the brakes screeching." Mr. Amore then said that he "decided to step on the gas and try to get in the driveway (the gravel crossover of the median), * * * but I didn't make it." When Mr. Amore saw the oncoming car, it was in the left passing lane, going in an easterly direction, which was the proper lane for the oncoming car to be in, in order to pass Mr. Amore's car.

To recapitulate, when Mr. Amore heard the screeching of the brakes, he testified that he was at, or was just passing, the center line of the eastbound lane. He then looked and saw the oncoming car. He took his eyes off the oncoming car for a couple of seconds, "to see where I was going into the cutaway" (the gravel part crossing the median). At this time he was moving at the rate of only two or three miles per hour. He then stepped on the gas and accelerated his speed— "speeded up"—out in front of the oncoming car. However, when he reached the gravel crossover, he slowed down. He testified: "I had slowed down. I didn't want to go too fast when I got to the other side of the driveway: * * * that is where I got hit." When he slowed down, only three quarters of his car was in the gravel crossway; a quarter length of the car was sticking out into the outer eastbound lane in the path of the oncoming car; and it was this part of the Amore car that was struck by the oncoming car, causing the injury and damages complained of.

There was no question that Mr. Amore, was guilty of negligence; but his negligence, under Massachusetts law, could not be imputed to his passengers, Mr. and Mrs. Gadano, the appellants in this case. If the driver of the oncoming car, William S. Badge, was also guilty of negligence causing the accident, appellants would have had a right to recover against him. Mr. Badge has since died, and, if he had been liable, his administrator, the defendant in this case, would be liable.

The issue, then, as it appears to us, is whether there was any basis upon which the jury could hold Mr. Badge guilty of negligence. At the close of appellants' proof, counsel for appellee moved for a directed verdict of no cause of action on the ground that there was no showing of any negligence on the part of Mr. Badge that constituted the proximate cause of the accident. The trial court denied the motion, "for the time being." At the close of all proofs, appellee's motion was renewed, and was once more taken under advisement by the court; but the case was finally submitted to the jury which, as above mentioned, returned a verdict of no cause of action.

From all the evidence in the case, it appears that Mr. Badge was traveling in the proper lane of the highway when the accident occurred. He was driving in the right-hand lane, next to the far-right emergency lane, as he approached the point where the collision took place. While the Amore car was standing still over in the emergency lane, Mr. Badge gradually went into the left or passing lane. This indicates unusual care. Mr. Amore testified that he started to go slowly ahead in the emergency lane, and then angled slowly to the left; and it was only when he got to the line between the traveled lane and the passing lane, that he heard the screeching of brakes and, as he says, saw the oncoming car in the left or passing lane, about 125 to 150 feet away. If Mr. Amore had at that point put his brakes on when he was going only two or three miles per hour, it is certainly to be presumed that the collision would not have occurred. If Mr.

Badge was driving at the legal speed of 60 miles per hour, he would have passed the point where Mr. Amore was, in less than 2 seconds. The evidence is undisputed that the Badge car was in the left or passing lane when Mr. Amore first saw it from a position of safety in the lane to the right.

When Mr. Badge, going 55 to 60 miles per hour, applied his brakes, his car continued right down the same lane, and although his car left skid marks for 150 feet to the point of impact, and then skidded sideways another 30 feet, it never left the passing lane, where it was being driven when Mr. Amore had first seen it coming.

A graduate mechanical engineer, called as an expert witness on behalf of defendant, testified that the minimum stopping distance for a 1955 Ford automobile, such as that operated by Mr. Badge on a concrete highway, when traveling at a speed of 60 miles per hour, would be approximately 210 feet. The witness testified that the coefficient of friction on concrete is higher than on macadam so that the stopping distance on a concrete highway would be shorter than on the macadam highway involved in the accident. The witness also testified that skid marks of 180 feet would indicate a speed of around 53 to 54 miles per hour. Furthermore, he stated that when skid marks culminate in an impact, the speed of the vehicle cannot be accurately measured for skid marks because there is no basis for determination of how far the car would have traveled except for the impact.

Mr. Badge, driving on a high-speed arterial highway, was not required to have his car under such control as to be able to avoid collision with a subordinate driver coming illegally into his path, until the continuing observation, which he was obliged to make, revealed, or should have revealed, to him, while in the exercise of due care as a reasonably prudent man, an impending danger. Mr. Badge was entitled to drive at the rate of 60 miles per hour, until he saw that Mr. Amore was illegally crossing the passing lane in front of him. At that time, the

stopping distance of the Badge car, proceeding at a speed of 60 miles per hour, was 210 feet. According to Mr. Amore, he was proceeding at a speed of only 2 or 3 miles per hour when he approached the passing lane at an angle and then suddenly started to cross the passing lane. At that time he was only 125 to 150 feet away from the Badge car.

There was no evidence of excessive speed on the part of Mr. Badge. The only statement appearing in the evidence on the question of speed was Mr. Badge's own statement to the police after the collision that he was traveling 55 to 60 miles per hour when he saw Mr. Amore turning to the left in front of him. The skid marks in this case are not evidence of excessive speed. The most to be said for this evidence is that it neither tends to prove nor disprove excessive speed. If he was traveling at a speed of 60 miles per hour, Mr. Badge, in the exercise of due care, could not have stopped his car within 210 feet, or for a distance of at least 60 feet beyond the point of collision. Confronted with the emergency created by Mr. Amore, Mr. Badge immediately put on his brakes to avoid the collision. With his car skidding the entire distance from the time he put on his brakes, it is fair to say that Mr. Badge could not have swerved to the right or to the left. Certainly, if he had been able to swerve to the right, he would have crashed full into the Amore car, except for the fact that Mr. Amore, a second before the collision, accelerated his car across the path of the oncoming car. If Mr. Badge had swerved to the left, he would have crashed full into the Amore car, which was three-fourths off the highway and in the median at the time of the collision.

While this case involves a dual highway of six lanes separated by a median strip, most of the relevant adjudications deal with trunkline highways and intersecting streets or roads; and the governing principles are similar.

In Arnold v. Krug, 279 Mich. 702, 273 N.W. 322, the plaintiff was a passenger in a car proceeding on a stop street intersecting a thru highway. The car did not stop at the stop sign but entered the intersection where it was struck by defendant's car which was traveling at a speed of 45 miles per hour. The defendant's driver did not slacken his speed, and because of the obstructed nature of the intersection, did not observe the car in which plaintiff was a passenger until it pulled out 20 to 25 feet in front. At the close of the proofs, both sides moved for a directed verdict, and the trial judge directed a verdict for plaintiff. On appeal, the Supreme Court of Michigan reversed, holding that defendant's driver was free from negligence as a matter of law. In its opinion, the Court said:

"The right of way accorded to a driver upon a trunkline highway is something more than the privilege of going through the intersection in advance of a car which reaches it at the same time. Drivers approaching the trunkline are required to stop before entering the intersection whether anyone is at or near the crossing or in sight on the trunk highway. It is an improved road—usually hard surfaced. Its purpose is to afford rapid transit. The driver is entitled to assume that those approaching it will obey the law and stop. He is not obliged to have his car under such control at each intersecting road that he may stop at once and avoid collision with persons who may illegally come into his path.

"On the other hand, he must keep such lookout ahead and to the sides and down intersecting highways as a reasonably prudent person would do in order to discover possible danger and must act carefully upon the existing conditions.

"A driver cannot be convicted of negligence on a general charge that he did not exercise the care a prudent person would have used under the circumstances. It is necessary to charge and prove the specific act he did or did not do. Wallace was driving on the right side of the road at a very reasonable rate of speed and with his truck under control. The

only claim of fault which could be made against him, and which the court found, is that he failed to reduce his speed as he neared the intersection. But to what rate should he have reduced the speed? It is evident that, to have avoided the collision, he would have had to so slacken his speed that he could have stopped well within 30 feet. To impose such a duty on drivers upon trunkline highways would seriously impair their purpose, be foreign to the general conception of careful drivers of their rights and duties upon them, in large measure destroy the preferential right of way, and offer inducement to drivers approaching on intersection roads to violate their legal duties. It is not the rule as a matter of law.

"Nor as a matter of fact was such duty to slacken speed imposed on Wallace. He was obliged to anticipate such possible danger in the intersection and do such acts to avoid it as a reasonably prudent person would have anticipated and done, if such person had the knowledge of the situation which Wallace possessed, and had the right to assume that one about to enter the trunk highway at the intersection would perform his legal duty to stop and look for traffic.

"It is hardly reasonable to say that a prudent person, driving on a through highway and familiar with the conditions, would have anticipated such progressively remote possibilities as that:

"(1) A car might come from the south on the rough and infrequently traveled road, where travel is necessarily slow and the duty to stop at the through highway thereby emphasized;

"(2) Its driver would not look for approaching cars on the through highway;

"(3) he would fail to observe a very common rule of law, and of even less than ordinary care, by neglecting to stop before entering the intersection; and

"(4) to cap the climax of a total want of common prudence—he would make a short turn to the left into a part of the intersection where he had no right to be."

As submitted by appellee, obviously the purpose of an arterial highway and particularly a turnpike such as that involved in the instant case, would be defeated if every driver were required to slow down upon observing another vehicle stopped to his right in the emergency lane. The duty of a driver such as defendant's decedent is only to do what a reasonable and prudent person would do and this does not require him to foresee the possibilities that a car would make an illegal and improper left turn into the median; that its driver would not observe approaching traffic before attempting such unlawful action; that the left-turning driver would not signal his intention to make a left turn; or that while in a position of comparative safety in the center of the highway and barely moving, the driver of the other car, upon observing approaching traffic would suddenly accelerate his vehicle in an attempt to beat the oncoming traffic.

There was no reason for Mr. Badge to anticipate the possibility that, within his stopping distance, the Amore car would suddenly cross in front of him in violation of the law. Mr. Badge was entitled to continue driving on the highway at a speed of 60 miles per hour until his observation, as a reasonably prudent man, revealed an impending danger. There appears to be no question that the law of Massachusetts, like the law of Michigan, is to the effect that there is no duty on the part of a driver on a favored highway to reduce his speed below the legal speed limit, in the absence of a showing of unusual circumstances, or until such driver is put on warning that his right-of-way is being challenged.

Mr. Badge was entitled to assume that his right-of-way would not be con-

tested by a driver suddenly crossing to the left in front of him. By the time the impending danger was revealed to him, Mr. Badge was so close to the point of danger and, at a rate of 60 miles per hour, was driving at such a speed as made it impossible for him to stop and avoid the collision, if Mr. Amore got out in front of him. See McGuire v. Rabaut, 354 Mich. 230, 92 N.W.2d 299.

In Noyce v. Ross, 360 Mich. 668, 104 N.W.2d 736, in a similar case, the Supreme Court stated:

"There can be no argument that defendant driver saw plaintiff Noyce's car at or near the earliest possible point and made a split-second decision under an emergency situation. His best judgment under these circumstances was that he should attempt to steer his car to a point behind the plaintiff's car so as to avoid what he felt would be a certain accident if he continued in a straight direction. The braking of the car and the driving to the right were the acts of a reasonably prudent man under the circumstances. Schow v. Paugh, 350 Mich. 304, 86 N.W.2d 261, clearly defines the obligation of defendant driver. There Justice Kelly said (350 Mich. at page 308, 86 N.W.2d at page 263):

" 'We have stated that one who suddenly finds himself in peril without time to consider the best means to avoid impending danger is not guilty of negligence if he fails to adopt what subsequently may appear to have been the better method, unless the emergency is brought about by his own negligence.'

"We cannot say, on a reading of the entire record, that defendant driver's acts under the 'emergency doctrine' constituted negligence that was a proximate cause of the accident. This leaves only the question of possible speed as the proximate cause of the accident. This is the real deficiency in plaintiffs' case. At the statutory maximum speed of 65 miles per hour, the reaction and braking distance of the favored driver would have required 452 feet in which to stop. Since defendant driver had considerably less than this number of feet in which to see plaintiff Noyce's car (and the record discloses he did so observe it and did act diligently) speed could not have been a factor and was not a proximate cause of the accident."

Like the defendant in the Noyce case, Mr. Badge was applying his brakes as soon as he, in the exercise of due care, could have anticipated that Mr. Amore was going to make a left-hand turn across his path. It is clear that the accident happened as a result of Mr. Amore's negligence in illegally making a sudden turn in front of Mr. Badge, who had no reason to anticipate such danger. When he first perceived the danger, there was nothing he could do to stop in time to avoid the collision. Where a vehicle, traveling at a lawful rate of speed, could not have been stopped in time to avoid a collision, the question of the speed of such vehicle should not be submitted to the jury.

There is nothing in the evidence—either the skid marks, or the collision itself—to indicate that Mr. Badge was, at any time, driving in excess of a speed of 60 miles per hour. There must be a showing of some facts to support the claim of excessive speed, and some showing that the fault of the defendant was a proximate cause of the accident. There is no evidence to indicate actionable negligence on the part of Mr. Badge. Our conclusions make it unnecessary to pass upon the other questions raised by appellants.

In accordance with the foregoing, it is our view that a verdict of no cause of action could, properly, have been directed by the trial court; and that the judgment entered on the verdict of the jury should be, and is, affirmed.